**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| INTERNATIONAL SNUBBING SERVICES, LLC, ET AL. | CIVIL ACTION NO. 26-1301 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| WILLIAM NICK JETER, ET AL. | MAGISTRATE JUDGE WHITEHURST |

# MEMORANDUM RULING

Before the Court is a Motion for Preliminary Injunction (Record Document 5) filed by Plaintiffs International Snubbing Services, LLC ("ISS") and SESI Corporate, LLC ("SESI") (collectively, "Plaintiffs"). Defendants Nick Jeter ("Jeter"), Bobby Drennan ("Drennan"), Kobi Hernandez ("Hernandez"), MPH Energy Services, LLC ("MPH"), and Morris P. Herbert, Inc. (collectively, "Defendants") responded to the motion and Plaintiffs replied. See Record Documents 49, 57, 58, and 76.[1] A hearing on the Motion for Preliminary Injunction was held on May 26-28, 2026. See Record Documents 83, 84, and 87. The Temporary Restraining Order (Record Document 12) entered on April 24, 2026 was also extended pending the ruling on the Motion for Preliminary Injunction. See Record Document 87.

Post-hearing briefing was ordered. See Record Document 87 at 2. Plaintiffs' post-trial memorandum was filed on July 20, 2026 and Defendants' post-trial memorandum was filed on August 7, 2026. See Record Documents 94 and 97. After consideration of

---

[1] On May 15, 2026, Plaintiffs filed a First Amended Complaint. See Record Document 70. Drennan was dropped as a defendant and Stephen ("Steve") Jude Williams ("Williams") was added as a defendant. See id. At the Preliminary Injunction hearing, defense counsel waived formal service on Williams and the parties stipulated to an answer due date. See Record Document 84. At the conclusion of the hearing, the parties agreed that the previously entered Temporary Restraining Order ("TRO") extended to Williams. See Record Document 87.

the evidence presented at the hearing and upon review of the post-hearing briefing, the Court hereby **GRANTS** Plaintiffs' Motion for Preliminary Injunction. The parameters of such injunction will be set forth in the instant ruling.

## PROCEDURAL BACKGROUND

In April 2026, Plaintiffs filed their Original Complaint against Jeter, Drennan, Hernandez, MPH, and Morris P. Hebert, Inc. Plaintiffs alleged that "[t]his action [arose] from a coordinated scheme by three former employees of ISS and their new employer MPH Energy to misappropriate ISS's trade secrets and rapidly replicate ISS's specialized well-intervention services business, which includes performing services such as plug and abandonments ('P&As'), hydraulic workover and snubbing ('HWO/Snubbing') operations, without incurring the time, expense, or risk required to build such an operation lawfully." Record Document 1 at 1. Plaintiffs alleged that the trade secrets included proprietary pricing models, customer specifications, operational and technical procedures, and workforce compensation data. See id. at 2-6. Plaintiffs asserted the following causes of action: violation of the Defend Trade Secrets Act ("DTSA") against all Defendants; breach of contract against Jeter, Drennan, and Hernandez; violation of the Louisiana Uniform Trade Secrets Act ("LUTSA") against all Defendants; violation of the Louisiana Unfair Trade Practices Act ("LUTPA") against all Defendants; civil conspiracy against all Defendants; and violation of the Computer Fraud and Abuse Act against Jeter; and conversion against all Defendants. See id. at 26-40. Plaintiffs further alleged corporate liability against MPH relating to the actions of Jeter, Drennan, and Hernandez. See id. at 41-42.

Additionally, Plaintiffs sought injunctive relief. See id. at 42-43. They filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction on the same day

as their Original Complaint. See Record Document 5. On April 24, 2026, the Court granted a Temporary Restraining Order ("TRO"), Order to Preserve Evidence, and Order to Show Cause for Preliminary Injunction. See Record Document 12. The Court stated that it "believe[d] Plaintiffs [had] shown one or more Defendants possess trade secrets and are in a position to use them." Id. at 1. Among other things, the TRO ordered that:

> 1. Defendants are restrained, enjoined, and prohibited from misappropriating, acquiring, using, disclosing or retaining ISS's Proprietary and Trade Secret Information;
>
> 2. Defendants are restrained, enjoined, and prohibited from directly or indirectly soliciting or recruiting ISS's employees to MPH Defendants' employment using ISS's Proprietary and Trade Secret Information;
>
> 3. Defendants are restrained, enjoined, and prohibited from directly or indirectly using, disclosing, or relying upon ISS's Proprietary and Trade Secret Information in connection with any bid, proposal, or service delivery for any customer, including but not limited to the Key Customer's Project; and
>
> 4. Defendants are restrained, enjoined, and prohibited from directly or indirectly soliciting ISS's customers using ISS's Proprietary and Trade Secret Information.

Id. at 2.

Plaintiffs filed a First Amended Complaint on May 15, 2026. See Record Document 70. See id. Drennan was dropped as a defendant and Williams was added as a defendant. Plaintiffs' breach of contract claim was asserted against only Jeter and Hernandez. See id. at 28-29.

Plaintiffs' Motion for Preliminary Injunction (Record Document 5) was set for hearing on May 26, 2026 and, as set forth above, is now ripe for adjudication. See Record Documents 37, 80.

**FINDINGS OF FACT**

ISS, founded in 1982, is a Louisiana-based oilfield services company that provides specialized well-intervention services to the oil and gas industry globally. ISS's well-intervention services include hydraulic workover and snubbing ("HWO/Snubbing") services. ISS developed HWO/Snubbing, plug-and-abandonment ("P&A"), and coiled tubing techniques tailored for its customers based on well-specific features. ISS has invested substantial time, money, and resources in understanding customer needs, developing strategies, preparing financial and operational forecasts, and selecting – and retaining – a highly skilled workforce. ISS also manufactures its equipment in-house and has equipment for both live and dead well intervention applications. ISS has accumulated information it considers proprietary and trade secrets, including pricing models, customer specifications, operational and technical procedures, and workforce compensation data.

Jeter began work at ISS in April 2013 as a roustabout. He signed a non-disclosure agreement at that time. See Record Document 91-4. Jeter moved through positions and was promoted within ISS. In December 2019, he was promoted to Operations Manager, a role he maintained until February 2026. As Operations Manager, Jeter testified he "kind of [took] care of everything." See PI Hearing 5-28-26 Transcript at 5. He managed the day-to-day operations of ISS's HWO/Snubbing services and routinely handled confidential business and technical information. Jeter had four company-issued devices: two laptops, an iPhone 16, and an iPad Air 2. The devices were subject to ISS policies. See Defense Exhibit 103 ("DX-103") at 5.

Hernandez joined ISS in 2007 as a roustabout. He was promoted to snubbing supervisor in 2015 and held that role until his departure in March 2026. As a snubbing supervisor, he reported to Jeter and supervised and trained HWO/Snubbing crews.

Hernandez was also issued company devices, including a laptop. See PI Hearing 5-27-26 Transcript at 60, 132. Like Jeter's, Hernandez's devices were subject to ISS policies. See DX-103 at 5.

ISS required Jeter and Hernandez, along with other employees, to read and sign all versions of the SESI Corporate Employee Handbook as a condition of their employment. Jeter and Hernandez signed the 2026 Handbook in November 2025. See Record Documents 91-6 and 91-7. The Handbook contains a confidentiality provision requiring all current and former employees to "maintain the confidentiality of all sensitive information during and after employment" and prohibits use of ISS's "Confidential Information for personal gain or to benefit another party." Record Document 91-2. Provisions prohibited the "use, reproduction, or disclosure of Company Intellectual Property for personal use or for the benefit of any third party without express written authorization," among other confidentiality provisions. Record Document 91-2; see also Record Document 91-5. ISS restricted employee access to sensitive information, including proprietary and trade secret information, to high level employees, like Jeter and Hernandez, with a legitimate need-to-know. See PI Hearing 5-26-26 Transcript at 53-54.

In the summer of 2025, Williams was in discussions regarding a business deal whereby he would acquire or partner with ISS. When a deal did not materialize, Williams formed MPH in November 2025. MPH was designed to be a full-service decommissioning company, with P&A, HWO/Snubbing, and coiled-tubing services. In February 2026, MPH purchased its first snubbing unit and it became operational that same month. See PI Hearing 5-28-26 Transcript at 160-161.

Williams first contacted Jeter via text message on January 30, 2026. See PI Hearing 5-28-26 Transcript at 6-7. Williams indicated he wanted to talk to Jeter about

coming over to MPH to run the HWO/Snubbing division. See id. at 7-8. Williams and Jeter met in Morgan City, Louisiana on February 1, 2026, to discuss MPH operations. See id. at 58. On February 2, 2026, Jeter accessed files and folders containing purported proprietary and trade secret information on his ISS computer. See id. at 74. While the files contained information about house plans for a personal home Jeter was building, they also contained at least two ISS documents. On February 7, 2026, Jeter accepted a job with MPH. On February 8 2026, Jeter tendered his resignation to ISS.

As early as February 1, 2026, Jeter approached other ISS employees to see if they might be interested in joining him at MPH. One of these employees was Hernandez. Hernandez and Jeter began talking – using Jeter's wife's phone and then later Jeter's new phone – about the possibility of Hernandez leaving ISS to work at MPH around February 1, 2026. In a February 16, 2026 text, Jeter sent Hernandez his MPH job offer with a clear instruction: "Make sure you grab all documents needed." Record Document 91-79 at 17. Hernandez liked, i.e., thumbs up, the command. See id. Hernandez also kept Jeter informed about ISS's day-to-day operations. See PI Hearing 5-27-26 Transcript at 64-65. On February 19, 2026, Jeter also asked Hernandez to send him the equipment loadout sheet for an ISS project and Hernandez complied. See Record Document 91-79 at 18; Record Document 91-93 at 47-48. Hernandez admitted that he sent the document using his personal Yahoo email account because he was "afraid that ISS would know [he's] sending an ISS document related to Freeport McMoran to Jeter." PI Hearing 5-27-26 Transcript at 64.

Hernandez resigned from ISS on March 2, 2026. Upon his resignation, he left his ISS-issued laptop, but Hernandez had in his computer bag a number of USB sticks containing ISS information from multiple prior jobs spanning many years. Hernandez

admitted at the hearing that the USB sticks he took from ISS, including Evidence 3/ES03, contained confidential information. See PI Hearing 5-27-26 Transcript at 68-70. Moreover, the evidence presented at the hearing demonstrated that within these USBs, MPH had access to a spreadsheet containing ISS's "entire business." PI Hearing 5-27-26 Transcript at 215; see also Record Document 91-23. At the hearing, Jacob Tauzin ("Tauzin"), senior operations manager at ISS, explained that the spreadsheet was a "snapshot at the time." PI Hearing 5-27-26 Transcript at 214. Tauzin testified that the spreadsheet It "would show the jobs that were going or ongoing" and "the work that was kind of on the schedule, like next up in the queue." Id. The USB sticks also contained engineering documents, Standard Operating Procedures ("SOPs"), Job Safety Analyses ("JSAs"), and Work Instructions ("WIs"). See 91-22; DX-234; DX-241; DX-236; DX-231; DX-233; and DX-053. Documents from at least one of the USB sticks was saved and uploaded to MPH's Cloud, specifically the personal OneDrive accounts of Paul Bernard ("Bernard"). See Record Documents 91-22 and 94-4; see also PI Hearing 5-28-26 Transcript at 252.

Hernandez and Jeter "decided that MPH Energy's snubbing SOPs, WIs, and JSAs could use some beefing up" because "you're required to have these forms, you know, to work for customers." Record Document 91-54 at 2; Record Document 91-93 at 20. Consequently, Hernandez located a set of ISS forms on a USB stick and provided it to Bernard. Bernard "took the ISS documents off the USB drive, loaded them into his computer, and then changed the logos on them and some other information." PI Hearing 5-28-26 Transcript at171.

On March 3, 2026, Plaintiffs sent cease-and-desist letters to Jeter and MPH, demanding preservation of evidence, return of company data, and cessation of his usage

of ISS's proprietary and trade secret information usage. See Record Document 91-104; DX-207. In response, Williams and Jeter discussed whether Jeter had taken any ISS material and Jeter denied it. See PI Hearing 5-28-26 Transcript at 216. Williams testified that he told Jeter: "If you do possess any documents from your previous employer, you are obligated to send it back. Also, do not make copies of any documents if possessed." Id. Williams testified that during the time frame the Court issued the TRO, he "knew nothing, which makes this [the hearing] a little humbling. I didn't know about any of the document copying." Id. at 217. Williams further testified that the copying was "embarrassing," that Jeter lied to him, and he thinks what Jeter "did looks really, really bad." Id. at 218. Likewise, Jeter admitted his actions were "dumb" and "stupid" and he was being "lazy and dumb." Id. at 35-36. Hernandez testified that the copying of the documents was "a lazy way out." PI Hearing 5-27-26 Transcript at 138.

## CONCLUSIONS OF LAW

### I. Preliminary Injunction Standard

In order to secure a preliminary injunction under Federal Rule of Civil Procedure 65, a plaintiff must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011). A preliminary injunction is an extraordinary remedy that "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." Ferrellgas, L.P. v. McConathy, No. CIV.A 1:10-CV-00178, 2010 WL 1010831, at *2 (W.D. La. Mar. 15, 2010), citing Bluefield Water Ass'n, Inc. v. City of Starkville, 577 F.3d 250, 253 (5th Cir.2009).

A plaintiff seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008). Such showing requires more than the possibility of some remote future injury. See id. at 22, 129 S. Ct. at 375-76; see also Aransas Project v. Shaw, 775 F.3d 641, 648 (5th Cir. 2014) ("To seek injunctive relief, the plaintiff must show a real and immediate threat of future or continuing injury apart from any past injury."). A preliminary injunction must also be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C., 710 F.3d 579, 586 (5th Cir. 2013).

II. DTSA and LUTSA

"To state a claim under the DTSA, a plaintiff must allege (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce." Source Prod. & Equip. Co. v. Schehr, No. CV 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017); 18 U.S.C. § 1836(b)(1). Under LUTSA, a plaintiff must allege (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) actual loss caused by the misappropriation. See Source Prod. & Equip. Co., 2017 WL 3721543, *5, citing Comput. Mgmt. Assis. Co. v. DeCastro, Inc., 220 F.3d 396, 403 (5th Cir. 2000). Both DTSA and LUTSA provide for injunctive relief against actual or threatened misappropriation of trade secrets. See Source Prod. & Equip. Co., 2017 WL 3721543, *5, citing La. Rev. Stat. § 51:1432(A); Providence Title Co. v. Truly Title, Inc., 732 F. Supp. 3d 656, 667 (E.D. Tex. 2024), aff'd, No. 25-40194, 2026 WL 1346202 (5th Cir. May 14, 2026), citing 18 U.S.C. § 1836(b)(3)(A).

Both DTSA and LUTSA similarly define "trade secret" as information that derives independent economic value from not being generally known to or ascertainable by other persons, that is the subject of reasonable efforts to maintain the information's secrecy. Alfasigma USA, Inc. v. EBM Med., LLC, No. CV 17-7753, 2018 WL 1604961, at *3 (E.D. La. Apr. 3, 2018), citing La. Rev. Stat. § 51:1431 and 18 U.S.C. § 1839 (2016). "Both statutes specifically identify 'compilations' as a type of information that may be protected." Incat Crowther Am., L.L.C. v. Birdon Am., Inc., No. CV 24-1061, 2025 WL 2410495, at *4 (E.D. La. Aug. 20, 2025). Courts generally recognize "that a compilation or aggregation of otherwise publicly available information constitutes a trade secret." Id. Efforts to maintain secrecy require only "reasonable measures." 18 U.S.C. § 1839; La. Rev. Stat. § 51:1431. Courts have referred to this standard as "relative secrecy as opposed to absolute secrecy." Sheets v. Yamaha Motors Corp., U.S.A., 849 F.2d 179, 183 (5th Cir. 1988). "The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures be taken to protect trade secrets." Id. Under both DTSA and LUTSA, "misappropriation" is defined as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5); see also La. Rev. Stat. § 51:1431(2).

III. LUTPA

LUTPA declares "it to be unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Quality Env't Processes, Inc. v. I.P. Petroleum Co., 2013-1582, p. 21 (La. 5/7/14), 144 So. 3d 1011, 1025, citing La. Rev. Stat. § 51:1405. "Because of the broad sweep of this language, Louisiana courts determine what is a LUTPA violation on a case-by-case basis." Id. The Louisiana Supreme Court "has consistently held that in establishing a LUTPA claim, a plaintiff must show that the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." Id. Yet, the gamut of prohibited practices under LUTPA is extremely limited because "LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence." Id. "[C]onduct that offends established public policy and is unethical is not necessarily a violation under LUTPA." Id. Section 1427 of LUTPA provides that it is "unlawful for a person . . . to develop or supply a service using stolen or misappropriated property." La. Rev. Stat. § 51:1427(A). Louisiana courts have also noted that even misappropriated

information falls short of the level of secrecy required to constitute a trade secret, the misappropriation may still rise to the level of a LUPTA violation. See Bihm v. Deca Sys., Inc., 2016-0356, pp. 25–26 (La. App. 1 Cir. 8/8/17), 226 So. 3d 466, 486.

## IV. Analysis

At this stage, this Court finds that Plaintiffs have met their Rule 65 burden. During the hearing, there was extensive testimony from Bryan Ellis, President of ISS; John Hardy, Senior Vice-President of Global Operation for ISS; and Tauzin regarding the independent economic value of the documents, such as SOPs, JSAs, and WIs, taken by Jeter and Hernandez and the reasonable measures taken by ISS to maintain the secrecy of such documents. Moreover, Jeter and Hernandez essentially admitted misappropriation of the documents at issue during their testimony. See Source Prod. & Equip. Co., 2017 WL 3721543, *5, citing La. Rev. Stat. § 51:1432(A); Providence Title Co., 732 F. Supp. 3d at 667, citing 18 U.S.C. § 1836(b)(3)(A) ("Both DTSA and LUTSA provide for injunctive relief against actual or threatened misappropriation of trade secrets."). In addition to the DTSA and LUTSA claims, the Court further notes that Plaintiffs asserted a LUPTA claim, which appears to encompass the actions of Jeter and Hernandez even if this Court were to find the existence of no trade secrets. See Bihm, 226 So. 3d at 486.

Defendants also admit in their post-hearing brief that "MPH possessed a lot of ISS's information." Record Document 97 at 6. Yet, the defense argues that the evidence adduced at the hearing showed that MPH did not use any of the information to obtain work or to solicit customers. See id. Notwithstanding, the defense submits that this Court does not need to decide whether Defendants misappropriated ISS's actual "trade secrets" because "Defendants are willing to consent to an injunction that would mirror the maximum preliminary relief to which ISS would be entitled if it had proved its case."

Record Document 97 at 11. Defendants propose "an agreed injunction" that "would require Defendants to return or destroy all ISS information (whether trade secrets or not) in Defendants' possession, including taking measures to detect any reintroduction of such material." Id. "Additionally, Defendants consent to an injunction barring use of any ISS trade secrets in the unlikely event some trade secret remains in Defendants' possession." Id. Defendants contend that "[o]nce ISS's information is removed from Defendants' possession, any threat of future irreparable harm pending the resolution of ISS's claims will be eliminated." Id., citing CAE Integrated, L.L.C. v. Moov Techs., Inc., 44 F.4th 257, 263 (5th Cir. 2022) (per curiam) ("As there is no continued access to the MacBook or Google Drive, there is no threatened future use of trade secrets.").

The defense concession would seem to end the Court's analysis. However, after entry of the TRO and before the Preliminary Injunction hearing, Plaintiffs submitted a proposed Preliminary Injunction (Record Document 76-45) that expanded the injunctive relief sought. Plaintiffs now seek the following injunctive relief:

1. Defendants their directors, officers, agents, employees, attorneys and others in active concert or participation with Defendants are restrained, enjoined, and prohibited from directly or indirectly:

    a. Misappropriating, acquiring, using, disclosing or retaining ISS's Proprietary and Trade Secret Information;

    b. Soliciting or recruiting Plaintiffs' employees to MPH Defendants' employment for two (2) years;

    c. Performing HWO/snubbing operations in the GOA for Chevron, Talos, Guardian, Renaissance, Freeport McMoran, ExxonMobil, White Fleet, or Oxy for two (2) years;

    d. Performing HWO/snubbing operations on U.S. Land for two (2) years.

2. Defendants their directors, officers, agents, employees, attorneys and others in active concert or participation with Defendants shall immediately:

   a. Return, delete, and certify the destruction of all ISS's Proprietary and Trade Secret Information in Defendants' possession, custody, or control; and

   b. Preserve all evidence relevant to this action, including but not limited to electronic devices, cloud storage accounts, messaging applications, email accounts, carrier records, call logs, metadata, and usage logs, and prohibiting any alteration, deletion, or spoliation of such evidence.

Record Document 76-45. Defendants challenge ISS's request to prohibit Defendants from: (1) soliciting or recruiting Plaintiffs' employees to MPH for two years; (2) performing HWO/snubbing operations in the GOA [Gulf of America] for Chevron, Talos, Guardian, Renaissance, Freeport McMoran, ExxonMobil, White Fleet, or Oxy for two years; and (3) performing HWO/snubbing operations on U.S. Land for two years. Defendants argue that ISS's request for such broad and sweeping injunctive relief is unprecedented and unsupported. The Court agrees.

While the Court believes injunctive relief is appropriate in this matter, the maximum appropriate injunctive relief mirrors what Defendants already are willing to consent to: (1) requiring Defendants to return or destroy all ISS information and copies made from ISS information; and (2) prohibiting Defendants from using any ISS information (whether trade secrets or not). This case involves trade-secret misappropriation, not violation of a non-compete or a non-solicitation agreement. See Daniels Health Scis., L.L.C., 710 F.3d at 586 (preliminary injunction must be narrowly tailored to remedy the specific action which gives rise to the order). Moreover, at this stage, the Court does not believe Plaintiffs have demonstrated that a two year ban from working on HWO/Snubbing is warranted. Such a request is not narrowly tailored. The

Court is also not convinced that ISS has shown how a future instance of soliciting business using ISS's proprietary and trade secret information could be likely once MPH no longer possesses any ISS information. See Aransas Project v. Shaw, 775 F.3d 641, 648 (5th Cir. 2014) ("Although past wrongs may help establish the threat of a future injury, they are insufficient alone."); Johnson Controls, Inc. v. Guidry, 724 F. Supp. 2d 612, 630 (W.D. La. 2010) ("To the extent that [the plaintiff] could demonstrate 'use' of the information contained on the customer lists for purposes of establishing an 'actual misappropriation' or that such use may be presumed, in general, past infractions, in the absence of a continuing violation or the likelihood of a future violation are not redressable through injunctive relief."). Plaintiffs cannot rely on a threat of speculative harm and/or supposition that a future violation is inevitable to support their request for such broad injunctive relief.

The Court further notes that Defendants do not propose that this Court or ISS take Defendants "at their word to return all ISS documents." Record Document 97 at 9. Instead, the Court orders the parties' forensic experts to jointly implement a remediation program to return and remove all ISS information. Such remediation plan shall ensure the prevention of the reintroduction of ISS information into the MPH electronic universe via the Cloud.

**CONCLUSION**

Based on the foregoing and noting Defendants' consent, the Court finds that entry of a Preliminary Injunction is appropriate in this matter. Defendants are hereby restrained, enjoined, and prohibited from directly or indirectly misappropriating, acquiring, using, disclosing or retaining ISS information (whether proprietary and trade secret information or not). Additionally, Defendants shall immediately return, delete, and certify the

destruction of all ISS's information (whether proprietary and trade secret information or not) in Defendants' possession, custody, or control, all in compliance with a Joint Remediation Plan to be established and implemented jointly by the parties' forensic experts. Certification pursuant to this requirement shall be filed in the form of affidavits of the forensic experts and the attorneys on behalf of their clients no later than December 7, 2026. Additionally, if counsel believe monitoring of the remediation process by the Court is needed, such concerns should be raised with Magistrate Judge Whitehurst during the November 9, 2026 telephone status conference.

A Preliminary Injunction Order consistent with the terms of the instant Memorandum Rulings shall issue herewith.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 6th day of November, 2026.

United States District Court